# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | | | |
|---|---|---|---|
| PROPERTY OF THE PEOPLE, INC. and RYAN NOAH SHAPIRO, | : : : | | |
| Plaintiffs, | : : | Civil Action No.: | 17-1677 (RC) |
| v. | : : | Re Document Nos.: | 25, 27 |
| OFFICE OF MANAGEMENT AND BUDGET, | : : : : | | |
| Defendant. | : | | |

## MEMORANDUM OPINION

### GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT; DENYING PLAINTIFFS' CROSS-MOTION FOR SUMMARY JUDGMENT

## I. INTRODUCTION

Before the Court for the second time on cross-motions for summary judgment, this Freedom of Information Act ("FOIA") case now involves only one narrow dispute. Plaintiffs Ryan Shapiro and Property of the People, Inc. contend that they are entitled to eight entries in a Microsoft Outlook calendar maintained by the Director of the Office of Management and Budget ("OMB"). According to OMB, each of these eight entries corresponds to a meeting of the National Security Council ("NSC") that concerned one of three subject matters: "foreign relations policy," "transportation policy," or "infrastructure policy." But beyond those general subject-matter descriptions, OMB has withheld the eight entries in their entirety—asserting the presidential communications privilege. The sole question for the Court, then, is whether OMB has established that this privilege claim is proper. For the reasons provided below, OMB has met its burden, so the Court grants the agency's motion and denies Plaintiffs'.

## II. LEGAL STANDARD

As the Court explained in its prior opinion in this case, FOIA "sets forth a policy of broad disclosure of Government documents in order to ensure an informed citizenry, vital to the functioning of a democratic society." *Prop. of the People, Inc. v. Office of Mgmt. & Budget*, 330 F. Supp. 3d 373, 379 (D.D.C. 2018) (internal quotation marks omitted) (quoting *FBI v. Abramson*, 456 U.S. 615, 621 (1982)). "The Act requires government agencies to make information available upon request, unless the information is protected by one of nine statutory 'exemptions.'" *Judicial Watch, Inc. v. U.S. Dep't of Def.*, 847 F.3d 735, 738 (D.C. Cir. 2017) (quoting *NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 136 (1975)); *see also* 5 U.S.C. § 552(b). Cases arising under the Act "typically and appropriately are decided on motions for summary judgment." *Pinson v. Dep't of Justice*, 313 F. Supp. 3d 88, 105 (D.D.C. 2018) (quoting *Defs. of Wildlife v. U.S. Border Patrol*, 623 F. Supp. 2d 83, 87 (D.D.C. 2009)). Summary judgment is generally warranted when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). For these purposes, a fact is "material" if it is "capable of affecting the substantive outcome of the litigation." *Pinson*, 313 F. Supp. 3d at 105. "A dispute is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the nonmovant." *Bloche v. Dep't of Def.*, 370 F. Supp. 3d 40, 49 (D.D.C. 2019).

This all means that, in the "FOIA context, a government agency is 'entitled to summary judgment if no material facts are genuinely in dispute and the agency demonstrates that its search for responsive records was adequate, that any exemptions claimed actually apply, and that any reasonably segregable non-exempt parts of the records have been disclosed after redaction of exempt information.'" *Id.* (internal quotation marks omitted) (quoting *Prop. of the People*, 330

F. Supp. 3d at 380). The burden is thus on the government, and that "burden does not shift even when the requester files a cross-motion for summary judgment because 'the [g]overnment ultimately has the onus of proving that the documents are exempt from disclosure,' while the 'burden upon the requester is merely to establish the absence of material factual issues before a summary disposition of the case could permissibly occur.'" *Hardy v. ATF*, 243 F. Supp. 3d 155, 162 (D.D.C. 2017) (internal quotation marks and brackets omitted) (quoting *Pub. Citizen Health Research Grp. v. FDA*, 185 F.3d 898, 904–05 (D.C. Cir. 1999)).

To meet its burden, the government may rely on affidavits or "declarations that are reasonably detailed and non-conclusory." *Pinson*, 313 F. Supp. 3d at 106. The Court may grant summary judgment based on such materials when they "demonstrate that the information withheld logically falls within the claimed exemption, and are not controverted by either contrary evidence in the record nor by evidence of agency bad faith." *Larson v. Dep't of State*, 565 F.3d 857, 862 (D.C. Cir. 2009) (quoting *Miller v. Casey*, 730 F.2d 773, 776 (D.C. Cir. 1984)). Thus, "[u]ncontradicted, plausible affidavits showing reasonable specificity and a logical relation to the exemption are likely to prevail." *Ancient Coin Collectors Guild v. U.S. Dep't of State*, 641 F.3d 504, 509 (D.C. Cir. 2011). That said, FOIA exemptions must also be "narrowly construed," and "conclusory and generalized allegations of exemptions are unacceptable." *Prop. of the People*, 330 F. Supp. 3d at 380 (quoting *Morley v. CIA*, 508 F.3d 1108, 1114–15 (D.C. Cir. 2007)).

### III. ANALYSIS

As the Court already noted, the parties' dispute at this stage of the proceedings is narrow. Plaintiffs now challenge only the withholding of eight calendar entries related to meetings of the NSC. According to OMB, those eight entries are exempt from disclosure under FOIA Exemption 5, which applies to agency records "that would not be available by law to a party . . .

3

in litigation with the agency," 5 U.S.C. § 552(b)(5). The exemption, in other words, "incorporates the traditional privileges that the Government could assert in civil litigation against a private litigant—including the presidential communications privilege." *Bloche*, 370 F. Supp. 3d at 50 (internal quotation marks omitted) (quoting *Loving v. Dep't of Def.*, 550 F.3d 32, 37 (D.C. Cir. 2008)).

As its name likely suggests, the presidential communications privilege "preserves the President's ability to obtain candid and informed opinions from his advisors and to make decisions." *Loving*, 550 F.3d at 37. It "applies to communications made in the process of arriving at presidential decisions," and it protects those communications in their entirety. *In re Sealed Case*, 121 F.3d 729, 745 (D.C. Cir. 1997). Naturally, then, the privilege protects "communications directly involving and documents actually viewed by the President" during that process of shaping policies and making presidential decisions. *Judicial Watch, Inc. v. Dep't of Justice*, 365 F.3d 1108, 1114 (D.C. Cir. 2004); *see also Nixon v. Adm'r of Gen. Servs.*, 433 U.S. 425, 449 (1977). But the privilege extends further as well: to communications "'solicited and received' by . . . 'immediate White House advisers'"—those with "'broad and significant responsibility for investigating and formulating the advice to be given to the President.'" *Loving*, 550 F.3d at 37 (omission in original) (quoting *Judicial Watch v. Dep't of Justice*, 365 F.3d at 1114).

Here, OMB does not assert that the eight NSC meetings constitute communications that actually reached the President. The agency concedes that the President did not himself attend the majority (and maybe all) of the eight meetings. *See* Def.'s Opp'n Pl.'s Cross-Mot. Summ. J. at 2 n.1, ECF No. 31. Rather, most of these meetings, OMB says, involved the NSC's Principals Committee ("PC") or Principals Small Group ("PSG")—which are the "Cabinet-level senior

4

interagency forum[s] for considering policy issues" affecting national security, *see* National Security Presidential Memorandum-4 ("NPRM-4"), 82 Fed. Reg. 16881, 16882 (Apr. 4, 2017).[1] Notwithstanding the President's absence, OMB contends that the eight meetings are privileged because the NSC is, by its nature, a body whose sole purpose is to advise the President. Consequently, any NSC meeting, OMB argues, is a communication "solicited and received" by the President's immediate advisers.

For their part, Plaintiffs avoid any argument that the Outlook calendar entries are not the kind of document that can be covered by the privilege. Instead, Plaintiffs focus on the fact that most of the members of the NSC (and the PC and PSG) are Cabinet officials or other agency heads—individuals whose primary responsibilities are to run their respective agencies, not formulate advice to the President. Thus, according to Plaintiffs, OMB has not established how these particular NSC communications were "solicited and received" by immediate White House advisers.

In the Court's view, OMB has the better of these arguments, for at least four reasons taken together:

*First*, though not dispositive, OMB is correct that the NSC and its subcommittees exercise no "meaningful non-advisory authority." *Armstrong v. Exec. Office of the President*, 90 F.3d 553, 565 (D.C. Cir. 1996). Indeed, "Congress has not itself . . . delegated substantial authority to the NSC." *Id.* By statute, the Council's functions are to:

> (1) *advise the President* with respect to the integration of domestic, foreign, and military policies relating to the national security so as

---

[1] The PSG is not mentioned specifically in NPRM-4, and neither of OMB's submitted declarations explicitly address it either. In one of its briefs, however, OMB clarifies that the PSG is a sub-group of the PC and is "chaired by either the National Security Advisor or the Homeland Security Advisor, with the Chief of Staff to the President as a regular attendee." Def.'s Opp'n at 6 & n.2. Plaintiffs do not question the truthfulness of these statements.

5

> to enable the Armed Forces and the other departments and agencies of the United States Government to cooperate more effectively in matters involving national security;
>
> (2) assess and appraise the objectives, commitments, and risks of the United States in relation to the actual and potential military power of the United States and *make recommendations thereon to the President*;
>
> (3) *make recommendations to the President* concerning policies on matters of common interest to the departments and agencies of the United States Government concerned with the national security; and
>
> (4) coordinate, *without assuming operational authority*, the United States Government response to malign foreign influence operations and campaigns.

50 U.S.C. § 3021(b) (emphasis added).

Historically, the President has not delegated significant non-advisory authority to the NSC either. *See Armstrong*, 90 F.3d at 561–65 (reviewing specific Executive Order delegations to the NSC and concluding that the NSC still filled no "role outside its statutory assignment to advise and assist the President"). And there is no indication that the current administration has departed from that tradition. *See* NPRM-4, 82 Fed. Reg. at 16881 (President Trump organizing "system for national security policy development and decision making" so as to "advise and assist" him in "ensur[ing] the safety and security of the American people"). Again, this general contextual background is not dispositive, but it is certainly relevant that the NSC plays no "substantive role apart from that of the President," *Armstrong*, 90 F.3d at 565, and exists to "advise" and "make recommendations to" him, 50 U.S.C. § 3021(b)(1)–(3). Against that backdrop, it seems at least likely that the meetings at issue here were "intimately connected to . . . presidential decisionmaking." *Sealed Case*, 121 F.3d at 753.

*Second*, the structure and composition of the NSC leave little doubt that the meetings fall within the ambit of the presidential communications privilege. Indeed, Council-wide meetings are generally chaired by the President himself. *See* NPRM-4, 82 Fed. Reg. at 16882. Those meetings are clearly privileged, as they constitute policy-oriented "communications directly involving . . . the President." *Judicial Watch v. Dep't of Justice*, 365 F.3d at 1114. Certain members of the Council are designated by statute, but the President also has the authority to name other members and invite additional government officials as regular attendees. *See* 50 U.S.C. § 3021(c). Indeed, the OMB Director currently falls into the latter category; President Trump has invited him to "any NSC meeting" as an "attendee." NPRM-4, 82 Fed. Reg. at 16882.

The PC and PSG meetings at issue in this case, meanwhile, are generally chaired by the National Security Advisor, who may delegate the role to the Homeland Security Advisor. *Id.*; Defs.' Opp'n at 6. Each of those positions easily qualifies as an immediate White House adviser for purposes of the privilege—a premise that even Plaintiffs do not appear to dispute. Both positions "have broad and significant responsibility for investigating and formulating the advice to be given to the President" on matters of national security and foreign policy. *Sealed Case*, 121 F.3d at 757. The National Security Advisor is "responsible . . . for determining the agenda for," not just PC and PSG meetings, but the NSC as a whole, which, as the Court just noted, exists to advise the President. NPRM-4, 82 Fed. Reg. at 16882. Only in the National Security Advisor's "sole discretion" may that responsibility be delegated to the Homeland Security Advisor. *Id.* As chair of PC and PSG meetings, the National Security Advisor or Homeland Security Advisor also must "determine the agenda" of the specific meeting at issue "in

consultation with the appropriate committee members." *Id.* And they are responsible for extending invitations to specific meetings at their "discretion." *Id.*

More generally, the National Security Advisor and Homeland Security Advisor do not require Senate confirmation and have "no official role outside the walls of the White House." *Protect Democracy Project, Inc. v. U.S. Dep't of Def.*, 320 F. Supp. 3d 162, 174 (D.D.C. 2018). That makes them different from Cabinet officials and many other agency heads, including the OMB Director. Those Cabinet-level officials "exercise substantial independent authority[,] perform other functions in addition to advising the President," and lead "operations that do not call ultimately for direct decisionmaking by the President," so the presidential communications privilege has more limited application to their records. *Sealed Case*, 121 F.3d at 752. The same concerns are not present with respect to the National Security Advisor or Homeland Security Advisor, though. In fact, in light of the considerations mentioned above, another district court in this circuit has already held that the Deputy NSC Legal Adviser constitutes immediate White House staff for purposes of the privilege. *See Protect Democracy Project*, 320 F. Supp. 3d at 173–74. It follows, then, that the Deputy Legal Adviser's superiors—who work even closer to the President—qualify as well. *See Sealed Case*, 121 F.3d at 752 (stating that privilege applies only to "communications . . . close enough to the President to be revelatory of his deliberations or to pose a risk to the candor of his advisers"); *Ass'n of Am. Physicians & Surgeons, Inc. v. Clinton*, 997 F.2d 898, 910 (D.C. Cir. 1993) ("operational proximity" to President determines whether "President's confidentiality interest" is implicated (emphasis omitted)).

To be sure, as Plaintiffs note, certain members of the NSC, PC, and PSG are Cabinet officials or agency heads—including, again, the OMB Director who is the subject of this lawsuit. As the Court just mentioned, the presidential communications privilege must be applied with

8

caution to the records of those "'dual hat' presidential advisers." *Sealed Case*, 121 F.3d at 752. The government bears the burden in those instances "of proving that the communications occurred in conjunction with the process of advising the President." *Id.*

Here, the role and structure of the NSC go a long way in making that required showing. But more to the point, Plaintiffs' misplaced focus on the mere *presence* of dual hat advisers at the meetings changes nothing. What matters for purpose of the privilege is who *solicits* the communication, and whether that person also ultimately *receives* it. In the context of NSC meetings, it is the President, the National Security Advisor, or the Homeland Security Advisor who does the soliciting, as it is those individuals who set the agenda and confer the invitations. And there is little doubt that they receive the communications as well, as they have to chair the meetings. So yes, Plaintiffs are correct that the Secretary of State, Secretary of Treasury, Secretary of Defense, Secretary of Energy, and others may be there, but it is implausible that those officials are the ones calling the meetings—because they lack the authority do so. Those dual hat officials certainly are not the ones who request the OMB Director's presence either, because the President already did that by inviting the Director to "any NSC meeting" as an "attendee." NPRM-4, 82 Fed. Reg. at 16882. Simply put, despite the attendance of Cabinet officials and agency heads, the NSC's structure gives the Court confidence that the meetings "occurred in conjunction with the process of advising the President." *Sealed Case*, 121 F.3d at 752.

*Third*, the Court thinks it relevant that the D.C. Circuit has held that the NSC is not itself an "agency" subject to FOIA. *Armstrong*, 90 F.3d at 567. In reaching that conclusion, the circuit stressed that 1974 FOIA amendments made clear that the Act was not "meant to cover 'the President's immediate personal staff or units in the Executive Office whose sole function is

to advise and assist the President.'" *Id.* at 558 (quoting H.R. Rep. No. 93-1380, at 14 (1974) (Conf. Rep.)). The NSC fell within that category, the circuit explained, because of reasons similar to those already mentioned here: "the close working relationship between the NSC and the President indicate[d] that" the Council was "more like 'the President's immediate personal staff' than it [was] like an agency exercising authority, independent of the President." *Id.* at 567.

Whether an entity constitutes an "agency" for FOIA purposes is admittedly a different question than whether a FOIA exemption applies. But the D.C. Circuit has indicated that one inquiry can still be "instructive" for the other, because "each inquiry ultimately involves shielding government documents from public scrutiny." *Judicial Watch v. Dep't of Justice*, 365 F.3d at 1119. And it matters here that a member of the public could not obtain the NSC's schedule directly from the NSC. Indeed, in cases "where Congress has intentionally excluded a governmental entity from [FOIA]," the D.C. Circuit "ha[s] been unwilling to conclude that documents or information of that entity can be obtained indirectly, by filing a FOIA request with an entity that *is* covered under" the Act. *Judicial Watch, Inc. v. U.S. Secret Service*, 726 F.3d 208, 225 (D.C. Cir. 2013) (citing *United We Stand Am., Inc. v. IRS*, 359 F.3d 595, 603 (D.C. Cir. 2004); *Goland v. CIA*, 607 F.2d 339, 346 (D.C. Cir. 1978)).

Thus, in *Judicial Watch v. Secret Service*, the circuit rejected an attempt to use FOIA to obtain the White House visitor logs from the Secret Service. *Id.* at 224–26. There, the circuit began with the "undisputed" premise that a litigant could "not obtain the appointment calendars (or visitor logs)" of "individuals employed in the 'Office of the President' . . . by sending a FOIA request to the White House Complex," where those individuals work. *Id.* 225 (quoting *Armstrong v. Exec. Office of the President*, 1 F.3d 1274, 1295 (D.C. Cir. 1993)). Those calendars simply are "not 'agency records' as FOIA defines the term." *Id.*

The records sought from the Secret Service, the circuit noted, were essentially "reconstruct[ed]" from those calendars. *Id.* The circuit then explained that there was "good reason to doubt that Congress intended to require the effective disclosure of the President's calendars" in such a "roundabout way." *Id.* This was particularly true given that "special considerations control when the Executive Branch's interests in maintaining the autonomy of its office and safeguarding the confidentiality of its communications are implicated." *Id.* at 226 (emphasis omitted) (quoting *Cheney v. U.S. Dist. Court.*, 542 U.S. 367, 385 (2004)). In light of those "separation-of-powers concerns," the circuit concluded that "[c]onstruing the term 'agency records' to extend to White House visitor logs—regardless of whether they [were] in possession of the White House or the Secret Service—could substantially affect the President's ability to meet confidentially with foreign leaders, agency officials, or members of the public" and "could render FOIA a potentially serious congressional intrusion into the conduct of the President's daily operations." *Id.* The circuit accordingly employed the canon of constitutional avoidance to rule that the Secret Service-held logs did not "fall within the scope of FOIA." *Id.* at 229.

Similar reasoning applies in this case. Again, without question, Plaintiffs could not obtain NSC meeting calendars from the NSC itself because those calendars are not "agency records" for purposes of FOIA. *See Armstrong*, 90 F.3d at 565; *see also Judicial Watch v. Secret Service*, 726 F.3d at 225. Yet Plaintiffs essentially want to indirectly "reconstruct" those calendars through requests to an entity, OMB, whose records are subject to the Act. From a practical standpoint, such a regime makes little sense. And like in *Judicial Watch v. Secret Service*, it would raise separation-of-powers concerns because it would threaten the ability of the President and his closest advisers to hold meetings and seek advice in confidence. *See* 726 F.3d

at 226. Of course, that need for confidentiality is why the presidential communications privilege exists in the first place. *See Sealed Case*, 121 F.3d at 750.

This all leads to the *fourth* and final reason for granting OMB's motion, which is that application of the presidential communications privilege to these specific records is consistent with the privilege's underlying purpose. Each calendar entry at issue may contain a minimal *amount* of information, but the *nature* of the information has the potential to be quite revelatory. At a minimum, the entries are likely to provide the dates of the meetings, as well as lists of attendees. In the context of NSC meetings, certain attendees are unlikely to be surprising or illuminating, but others could be. After all, "[i]nvitations to participate in specific Council meetings [are] extended to those heads of executive departments and agencies, and other senior officials, who are needed to address the issue or issues under consideration." NPRM-4, 82 Fed. Reg. at 16882. With the benefit of hindsight, observers could potentially use the timing and attendees of a given meeting to infer the specific issues that were discussed and possibly even the general substance of the conversations. *See Sealed Case*, 121 F.3d at 750–51 ("Knowledge of factual information gathered by presidential advisers can quickly reveal the nature and substance of the issues before the President, since '[i]f you know what information people seek, you can usually determine why they seek it.'" (alteration in original) (quoting *Ass'n of Am. Physicians & Surgeons*, 997 F.2d at 910)).

As the Court just said, this is exactly what the privilege is meant to prevent. The privilege is rooted in the need "for confidentiality to ensure that presidential decisionmaking is of the highest caliber, informed by honest advice and full knowledge." *Id.* at 750. And that confidentiality must be extended to the President's immediate advisers (like the National Security Advisor and Homeland Security Advisor) because "potential exposure of the

information in the possession of an adviser can be as inhibiting as exposure of the actual advice she" ultimately gives to the President. *Id.* Indeed, "[w]ithout protection for her sources of information, an adviser may be tempted to forego obtaining comprehensive briefings or initiating deep and intense probing for fear of losing deniability." *Id.* Extension of the privilege to those immediate advisers thus "ensures the expression of 'candid, objective, and even blunt or harsh opinions' and the comprehensive exploration of all policy alternatives before a presidential course of action is selected." *Id.* (quoting *United States v. Nixon*, 418 U.S. 683, 708 (1974)).

Plaintiffs do not dispute the legitimacy of these principles. Instead, their final objection is that OMB has not provided sufficient detail to show that these eight NSC meetings in particular were "intimately connected to . . . presidential decisionmaking." *Id.* at 753. It is true that OMB's submissions do not explain the role each meeting played in contributing to a specific presidential action. The agency's *Vaughn* index only states that each meeting was "with the National Security Council" and provides a short subject-matter description—"foreign relations policy," "transportation policy," or "infrastructure policy." *See* 3d Decl. of Heather V. Walsh, Ex. 1, ECF No. 25-2. But recall that, absent "contrary evidence in the record" or "evidence of agency bad faith," OMB merely must show that the meetings "logically fall[]" within the scope of the privilege. *See Larson*, 565 F.3d at 862 (quoting *Miller*, 730 F.2d at 776). And, as the Court has already explained, the advisory nature of these NSC meetings is self-evident, and they occurred at close "operational proximity" to the President, *Ass'n of Am. Physicians & Surgeons*, 997 F.2d at 910. OMB therefore "need not make a particularized showing about the role" of each communication in a specific presidential decision. *See Protect Democracy Project*, 320 F. Supp. 3d at 174.

13

Rather, for purposes of OMB's burden, it is significant that foreign policy, transportation, and infrastructure are all subjects that fall plausibly within the NSC's mandate to "advise the President with respect to the integration of domestic, foreign, and military policies relating to the national security." 82 Fed. Reg. at 16881. Plus, in addition to the *Vaughn* index, OMB has submitted a declaration from the Director's Chief of Staff, Emma Doyle, who "manage[s] the Director's calendar and often . . . accompan[ies] him to meetings, including with the President, Vice President, Cabinet Secretaries, senior White House advisors, and Members of Congress." Decl. of Emma K. Doyle ¶ 2, ECF No. 25-3. As a result, Doyle is "able to accurately characterize the nature of all of the meetings as to which OMB is applying the presidential communications privilege based upon either (1) [her] personal attendance at those meetings, or (2) for meetings that [she] did not attend, [her] review of pertinent contemporaneous records with either the Director, the Deputy Director, or other OMB staff." *Id.* ¶ 3. Doyle, in other words, has personal knowledge of the meetings at issue, and, with that knowledge, she has confirmed that each of the meetings was held for the "purpose of formulating advice to the President with respect to presidential decisions." *Id.* ¶ 11; *see also id.* ¶ 3 ("[E]ach . . . meeting was in furtherance of presidential decisionmaking."). Absent any evidence to the contrary, the Court sees no reason to question this sworn statement, which is entirely plausible given that the President has not delegated any substantive, independent authority to the NSC.

Indeed, because the NSC is a purely advisory entity with no meaningful role apart from the White House, *see Armstrong*, 90 F.3d at 565, Doyle's declaration and the *Vaughn* index are enough to demonstrate that the eight meetings were communications solicited and received by immediate White House advisers "in the course of preparing advice to the President," *Sealed Case*, 121 F.3d at 752. OMB has accordingly met its burden of showing that the calendar entries

corresponding to the meetings fall within the scope of the presidential communications privilege. The entries are thus exempt from disclosure under FOIA Exemption 5.

## IV.  CONCLUSION

For the foregoing reasons, OMB's motion for summary judgment is **GRANTED** and Plaintiffs' cross-motion is **DENIED**.  An order consistent with this Memorandum Opinion is separately and contemporaneously issued.

Dated:  August 19, 2019                                                            RUDOLPH CONTRERAS
                                                                                                    United States District Judge